# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 11-57 |
| | ) | Judge Nora Barry Fischer |
| KEENA J. STANTON, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

### I. INTRODUCTION

Presently before the Court is a Motion to Suppress Evidence filed by Defendant Keena J. Stanton on June 7, 2012. (Docket No. 54). Defendant initially sought to suppress: (1) a Mossberg .20 gauge shotgun wrapped in clothing that was thrown from a vehicle he was driving on July 31, 2010, during a vehicle pursuit with Pittsburgh police; (2) statements made while being taken into custody following this incident; and (3) two bags of crack cocaine, a digital scale and two pistols recovered during a subsequent search of a residence at 310 Broadway Avenue, Pitcairn on September 9, 2010. (*Id*.). The Government opposed Defendant's motion, asserting that Defendant lacked standing to challenge the constitutionality of the Government's collection of evidence and that the evidence was otherwise not subject to suppression. (Docket No. 61). After considering the parties' submissions and the transcript of the hearing held on August 15, 2012, (Docket No. 77), the Court ruled that Defendant lacked standing to challenge the admissibility of the abandoned shotgun during the vehicle pursuit. (Docket No. 82). However, the Court held that Defendant had sufficiently alleged standing to challenge both the introduction of his statements as well as the evidence found during the September 9, 2010 search of the Pitcairn residence. (*Id*.).

A suppression hearing was then held on November 6, 2012. (*Id*.). The transcript of the

hearing has been produced and was fully considered by the Court. (Docket No. 87).[1] The Court also ordered the parties to submit proposed findings of fact and conclusions of law. (Docket No. 85). On December 21, 2012, the Government filed its proposed findings of fact and conclusions of law.[2] (Docket No. 90). The Government also filed a supplement to its proposed findings of fact and conclusions of law on January 8, 2013. (Docket No. 93). The Court ordered Defendant to submit proposed findings of fact and conclusions of law by January 3, 2012. (Docket No. 82). The Court has yet to receive this filing and Defendant has not sought leave of court to file it *nunc pro tunc*.

Upon consideration of the parties' submissions, the evidence presented during the motion hearing and for the following reasons, Defendant's motion to suppress [54] is denied.

**II. BACKGROUND**

*A. Charges and Potential Penalties*

Defendant was charged by Superseding Indictment with five counts: two counts of Possession of a firearm or ammunition by a convicted felon on July 31, 2010 and September 9, 2010, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e); one count of maintaining a drug involved premises on or about August 15, 2010 through September 9, 2010, in violation of 21 U.S.C. § 856(a)(1); one count of possession with intent to distribute crack cocaine, on or about September 9, 2010, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one count of possession of a firearm during and in relation to a drug trafficking crime, on or about August 15, 2010 through September 9, 2010, in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Docket No. 37).

A conviction at Counts One and Two each carry with them a potential term of imprisonment of no more than ten years. 18 U.S.C. § 924(e). However, if Defendant has three

---

[1] Future citations to the Docket No. 87 Transcript shall be referred to as "Tr. at _".
[2] The Court had instructed the Government to file its findings of fact and conclusions of law by December 20, 2012, but the Court granted a motion on December 21, 2012 permitting a filing *nunc pro tunc*. (Docket No. 89).

previous convictions for a violent felony or serious drug offenses, then the term of imprisonment is not less than fifteen years to a maximum of life imprisonment. (*Id*.). A conviction at Counts Three and Four both carry with them a potential term of imprisonment of not more than twenty years, however, Count Four carries a term of imprisonment of not more than thirty years for a second or subsequent felony drug conviction. 21 U.S.C. §§ 856(b), 841(b)(1)(C). Last, Count Five carries a term of imprisonment of not less than five years, nor more than life imprisonment. 18 U.S.C. § 924(c)(1)(A)(i).

B. Findings of Fact[3]

The credible evidence offered at the November 6, 2012 suppression hearing establish the following facts. First, the Government introduced testimony from Officer Arthur Baker, a Narcotics Detective with the City of Pittsburgh Police. (Tr. at 7). Officer Baker and another officer placed Defendant into custody following the July 31, 2010 vehicle pursuit. (Tr. at 8). After Defendant had been apprehended and hand-cuffed, Officer Baker first asked whether he had a permit for a concealed weapon, which Defendant answered negatively. (Tr. at 11). Defendant then answered personal identification questions requesting his name and date of birth. (Tr. at 13). While placing Defendant into the police vehicle, Officer Baker asked for his address. (Tr. at 14). Defendant then became confrontational, saying: "I'm a Crip. This ain't nothing!" (*Id*.). Officer Baker asked no further questions and another officer then drove Defendant to the police station. (Tr. at 17). Officer Baker had no further contact with Defendant. (*Id*.).

Next, the Government called Officer Marc Wilner, an Allegheny County Adult Probation Officer who had been assigned to supervise Defendant. (Tr. at 20). Officer Wilner was

---

[3] It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Hill*, Cr. No. 07-371, 2008 WL 2367185, *5 (W.D. Pa. June 6, 2008) (unpublished) (quoting *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007)) (citations omitted)).

3

automatically notified following Defendant's July 31, 2010 arrest. (Tr. at 23). On August 2, 2012, Officer Wilner applied for and obtained an arrest warrant due to Defendant's alleged probation violation.[4] (Tr. at 23). When Defendant failed to attend his preliminary hearing, another arrest warrant was issued.[5] (Tr. at 24). Defendant remained at large and Officer Wilner was unable to learn of Defendant's whereabouts until he received a phone call from a confidential informant ("CI") about a month later. (Tr. at 25).

Officer Wilner's report regarding his communication with CI was introduced as Government Exhibit 2. (Tr. at 62). The report recounts that CI first called Officer Wilner from the Pitcairn Police Department on September 9, 2010. (Govt. Ex. 2). CI informed Officer Wilner that she was the co-signer of the lease for 310 Broadway Avenue, Apartment 3, Pitcairn, PA. (*Id*.). She believed that her two friends who resided there needed help because "Kane," the name by which CI knew Defendant, had been staying with them at the residence. (*Id*.). CI became aware of the situation because she had been stopping by the residence on a daily basis to check up on an ill tenant. (*Id*.). In the past, Defendant had provided the tenants with drugs, and he was now doing the same again. (*Id*.). The residents had become fearful because Defendant began bringing firearms into the residence and was storing them above the kitchen cabinets. (*Id*.). The same day as the initial phone call, Officer Wilner met with CI at the Pitcairn Police station, and she identified Defendant from a mug shot provided by police. (*Id*.). CI knew that Defendant was not at the residence at that time and would check back with Officer Wilner when he was present. (*Id*.). That night, CI informed Officer Wilner that Defendant was at the residence, and agreed to stay in her vehicle to observe if Defendant left before authorities arrived. (*Id*.). As the co-signer

---

[4] Government Exhibit 3 is this warrant issued by Judge Jeffrey Manning of the Court of Common Pleas of Allegheny County. (Govt. Ex 3). The warrant contains two addresses for Defendant, neither being the location where he was ultimately apprehended. (*Id*.).
[5] This Bench Warrant was introduced at the hearing as Government Exhibit 4.

4

of the lease, CI gave Officer Wilner consent to search the premises,[6] and even went as far as to offer him a key, which he refused. (*Id*.).

Officer Wilner was not part of the unit that went inside the residence to apprehend Defendant. (Tr. at 27). Instead, the Government called Theodore Hughes, a Deputy Sheriff with the Allegheny County Sheriff's Office who was part of the team of detectives that went into the Pitcairn residence on September 9, 2010. (Tr. at 65). Upon arriving at the front door, Deputy Hughes recalled that the team knocked on the door. (*Id*.). A middle-aged white female answered the door and she consented to their entrance for the specific purpose of finding and arresting Defendant. (Tr. at 66). Defendant was found and apprehended in a bedroom, and a search incident to arrest was conducted. (*Id*.). During the search, the officers found a knotted bag that contained crack cocaine in Defendant's pocket. (Tr. at 67). While Defendant was being detained, another officer saw a digital scale on a table and a different bag of crack cocaine on the floor in the living room. (*Id*. at 68). Tenant Donna Gessley provided written consent to search the property; however, co-tenant Robert Liberto did not consent to such a search.[7] (*Id*.). The officers conducted a search of the premises and found the two pistols located above the cabinets as CI had described to Officer Wilner. (Tr. at 68).

The Allegheny County Sheriff's Office Arrest Report prepared by Officer Hughes on September 14, 2010 states the following relevant "Details of Arrest:"

> … At the briefing we learned that Stanton was staying at 310 Broadway Ave. (Apt. -3) in Pitcarin [*sic*]. They also learned that residence belonged to Donna Gessley and Robert Liberto. The detectives, adult probation officers, and Pitcarin [*sic*] police officers went to 310 Broadway Ave. to serve the warrant. A white

---

[6] This consent was conditional upon Defendant being found present at the residence. (Tr. at 61). Wilner testified that if Defendant was not at the premises, they would not have conducted a search. (*Id*.).

[7] Government Exhibit 5 was the Consent to Search Premises introduced by the Government signed by Gessley. (Govt. Ex. 5). The same form was filled out by Robert Liberto, although he did not consent to such a search. (Govt. Ex. 6)

> female (Donna Gessley) answered the door of that residence. The detectives, probation officers, and Pitcarin [*sic*] officers entered that apartment and started searching for Stanton. Prior to locating Stanton, probation officer Lauren Gerlach observed a black digital scale on the end table in the living room and on the floor directly in front of that table was a knotted plastic bag containing an off white substance (suspected crack cocaine). The search continued through the apartment and Stanton was located in the bedroom.
>
> He was ordered to the ground and handcuffed and shackled for officer safety. After the apartment was cleared, Stanton was brought to his feet. He then was searched for weapons and contraband by Deputy Bishkoff [*sic*]. As Bishoff was patting Stanton's right pocket he felt a lump inside. When Bishhoff [*sic*] pulled his pocket out of pants a knotted plastic bag containing an off white substance (suspected crack cocaine) fell to the floor. I (Det. Hughes) also observed that object fall to the floor. Stanton was escorted from that apartment to a marked sheriff's unit and transported to ACJ.
>
> Following up on the information regarding possible weapons in the residence, Lt. Kearney conferred with Ms. Geesly [*sic*] provided with her Miranda Warning and obtained her signature on a consent to search form. After receiving Ms. Gessley permission a search for drugs and weapons was started. As Lt. Kearney was searching the tops of the kitchen cabinets he recovered two pistols (1) 9MM semi-auto, … (2) Browning Arms, 22 Cal. Semi-auto, …. Neither ownership or stolen could be established [*sic*]. The search was concluded and was negative for additional weapons.
>
> K-9 Officer Willison and his dog's search of the residence for additional drugs was negative.

(Govt. Ex. 1). The Report then lists additional information regarding the guns, crack cocaine and digital scale that were found in the residence. (*Id*. at 2).

### III. DISCUSSION

In his motion to suppress, Defendant first argues that his statements made after the vehicle pursuit arrest were obtained unlawfully because he was not advised of his constitutional rights prior to any interrogation while he was in custody. (Docket No. 55 at 2). Additionally, Defendant argues that the scale, guns and two bags of crack cocaine seized during Defendant's

6

arrest and the search of 310 Broadway Avenue should be suppressed because the search and seizure of the items therefrom was unlawful, illegal and in violation of his constitutional rights. (*Id*. at 3-4). He claims that because the property was not listed as his own residence, the authorities did not have legal authority to conduct a search and that the subsequent seizure of the items was a result of this illegality. (*Id.* at 4). He avers that the authorities lacked reasonable suspicion to conduct a search of his person and the Pitcairn residence. (*Id*.). Last, he claims that the entry into the residence and search of Defendant violated state law, which requires reasonable suspicion prior to any warrantless search of the parolee's person or property. (*Id*.).

The Government responds that Defendant's statements are admissible as evidence because the questions asked were not likely to elicit an incriminating response from Defendant. (Docket No. 90 at 4). With respect to the September 9, 2011 seizure, the Government first argues that the Defendant has not established standing to warrant a suppression hearing. (Docket No. 61 at 10). The Government further contends that even if Defendant demonstrates that he has standing to contest the search, authorities possessed the requisite reasonable suspicion to enter the premises of a third party. *Id*. Thus, the Government maintains that there was a valid search incident to arrest resulting in the seizure of the bag of crack cocaine. (Docket No. 90 at 8). The Government also argues that the contraband seized from the living room is admissible because it was found pursuant to the plain view exception to the search warrant requirement. (Docket No. 61 at 12). Finally, the Government claims the search was valid because consent was given and if it was not valid, the evidence would have inevitably been discovered and seized as it was in plain view. (Docket No. 90 at 9).

*A. Statements Made by Defendant*

Defendant claims his statement that: "I'm a Crip! This ain't Nothing," made while being placed into the police car is inadmissible because it was a result of questioning that took place in violation of his *Miranda* rights. (Docket No. 54). The Supreme Court has determined that a suspect must be given specific warnings of his Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Court further explained "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. The Court later clarified that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Government bears the burden of showing that a statement given prior to *Miranda* warnings is admissible. *United States v. Shaird*, 463 F. App'x. 121, 123 (3d Cir. 2012) (unpublished) (citing *Brown v. Illinois*, 422 U.S. 590, 604 (1975)).

Certain questions asked by the authorities do not require *Miranda* warnings. The "public safety" exception permits questions that are necessary to protect either the public or police from eminent danger. *New York v. Quarles*, 467 U.S. 649, 656-57 (1984); *see also United States v. Pete*, No. 09-CR-82, 2010 WL 887364, at *6, n.2 (W.D. Pa. Mar. 10, 2010) (unpublished) (holding that no *Miranda* warning was necessary to ask whether defendant was armed after seeing permit to carry a firearm), *aff'd* 463 F. App'x. 113 (3d Cir. 2012) (unpublished). "[B]iographical data necessary to complete booking or pretrial services" fall within the "routine booking question" exemption of questions not falling within *Miranda's* protections. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Furthermore, "[v]olunteered statements of any

kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. Thus, if Defendant spontaneously made his statements without being prompted by an interrogation, these statements would be admissible. *See Brown v. Phelps*, No. A-08-596-GMS, 2011 WL 6069072, at *5 (D. Del. Dec. 2, 2011) (unpublished) ("Significantly, spontaneous statements that were not made in response to interrogation or its functional equivalent are not barred by *Miranda*") (citing *Innis*, 446 U.S. at 299-301).

The Court has already determined that Defendant was in custody for Fifth Amendment purposes. (Docket No. 82). The issue is now whether Defendant was read his *Miranda* rights, and if not, whether his statements were a result of a "custodial interrogation." The Government has not presented any evidence that Defendant was read his *Miranda* rights. Indeed, Officer Baker, the individual who took Defendant into custody, stated at the Suppression Hearing that he did not advise him of his rights. (Tr. at 11). Officer Baker also admitted that Defendant was handcuffed and in his custody when the statements were made. (*Id*.). The first question he asked was whether Defendant had a permit to carry a concealed firearm. (*Id*.). He then began getting Defendant's identification information, such as his name and date of birth. (*Id*.). After answering those questions, Defendant became confrontational when Officer Baker requested his address. (*Id*. at 14). As Defendant was being placed into the police car, he began screaming: "I am a Crip! This ain't nothing." (*Id*.). Even though Officer Baker stopped requesting information from Defendant, he continued repeating this same statement. (*Id*.).

The Court will not suppress Defendant's statement that declares his affiliation with the Crips because such statements were not obtained in violation of his constitutional rights. Officer Baker initially asked whether Defendant had a permit to carry a concealed firearm, a question pertinent to officer safety. Officer Baker next asked Defendant purely routine biographical

9

questions and Defendant has not raised any genuine issue as to how they amounted to anything "that the police should know [was] reasonably likely to elicit an incriminating response" from Defendant. *Innis* at 205. Even if the questions were found to constitute an interrogation, the disputed statements were voluntary and completely unrelated to that line of questioning. *Miranda*, 384 U.S. at 478. Therefore, although made while under police custody, the Government has shown that Defendant's statements were not prompted in violation of his *Miranda* rights and thus, the statements will not be suppressed.

   B. *Evidence Discovered as a Result of the September 9, 2011 Search*

Defendant also moves to suppress the evidence seized during the September 9, 2011 search of his person and of the 310 Broadway Avenue residence. (Docket No. 54). Defendant avers that the search of the residence and seizure of items therefrom were unlawful, illegal and in violation of his constitutional rights because: (1) the officers did not have a search warrant nor probable cause to believe that Defendant was present in the residence; (2) the subsequent seizure of items, including the search of Defendant's person, was a direct result of the initial entry; (3) the illegal entry rendered any subsequent consent to search the residence invalid; and (4) the warrantless entry was without reasonable suspicion. (*Id.* at 4).

   a. <u>Standing as to the Search of 310 Broadway Avenue</u>

The Government first contends that Plaintiff has not established that he has a legitimate expectation of privacy so as to challenge the search of the 310 Broadway Avenue residence. "[C]apacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citation and internal quotation marks omitted). An individual that is merely present with the consent of the householder may not

claim the same Fourth Amendment Protection as an overnight guest. *Id.* at 90; *see also Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectation of privacy that we all share.... [S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home."). "To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized." *United States v. King*, No. 09-1434, 2010 WL 438417, *5 (3d Cir. Feb. 8, 2010) (unpublished) (citing *Minnesota v. Olson*, 495 U.S. at 96-97).

Following the August 15, 2012 hearing, the Court shifted the burden upon the Government to justify the search and seizure. (Docket No. 82 at 12). In response, the Government claims that Defendant was merely at the residence to sell drugs and that his true residence was with his girlfriend near the 310 Broadway Avenue address. No evidence has been presented to support this claim.[8]

On the other hand, Officer Wilner's communications with CI support the conclusion that Defendant had an expectation of privacy in 310 Broadway. Officer Wilner testified that CI had seen Defendant at the residence "more than once." (Tr. at 25-26). Although CI reported that Defendant was dealing narcotics out of the residence, (Tr. at 41), Officer Wilner also testified that CI told him that "[Defendant] was staying there." (Tr. at 57, 60). Although no addressed mail, clothing or witness testimony was produced relating to Defendant's status, the evidence does show that Defendant had been staying at the residence for some time. Defendant had not

---

[8] The girlfriend's residence was one of the two addresses listed with Defendant's probation officer. (Tr. at 57). This other Pitcairn address was listed on the first arrest warrant issued on August 2, 2010 as his last known address (Govt. Ex. 3), but Wilner was not able to find Defendant at that address or his Pittsburgh address between August 2 and September 9. (Tr. at 34).

11

been located at his other listed residences by his probation officer, and CI had seen Defendant multiple times at the residence, stating that he had been staying there. Accordingly, based on the present record, it appears that Defendant was more than just a "short-term guest" and had an expectation of privacy in 310 Broadway. Therefore, he has established standing to challenge the evidence resulting from the September 9, 2010 search of 310 Broadway Avenue.[9]

b. Suppression of Evidence Found at 310 Broadway Ave.

The Supreme Court has long held that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971)). Officers acting under the authority of an arrest warrant may enter a suspect's residence to make an arrest if they have probable cause to believe that the suspect is in the home. *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005) (citing *Payton*, 445 U.S. at 602-603). While "[p]olice may not enter the residence of a third party to search for an individual subject to arrest unless they have a separate search warrant to do so or the third party's consent," *Williams v. City of Philadelphia*, 454 F. App'x. 96, 98 (3d Cir. 2011) (unpublished) (citing *Steagald v. United States*, 451 U.S. 204, 205-06 (1981)), "officers may enter a third party's residence to arrest the subject of an arrest warrant if they have probable cause to believe [he] is inside." *United States v. King*, 604 F.3d 125, 137 (3d Cir. 2010) *cert. denied,* 131 S. Ct. 1467 (U.S. 2011).

In assessing "whether the police had probable cause to believe a suspect was residing and present in a home, we apply a common sense approach and consider the facts and circumstances

---

[9] The Court does recognize defense counsel's argument that 310 Broadway is "a residence to which the Defendant did not even have a privacy interest" in her supplemental brief addressing Rule 404(b) issues. (Docket No. 91, Supplemental Brief to Defendant's Motion to Produce Evidence that the Government Intends to use Under Federal Rules of Evidence 404(b) and 609 and Motion to Sever). If Defendant maintains this statement, then he would lack standing to challenge the evidence found during the September 9, 2010 search of 310 Broadway Avenue. Because the Court concludes there was no Fourth Amendment violation, there is no need to further address the legal effect of Defendant's statement.

within the knowledge of the law enforcement agents, when viewed in the totality." *United States v. Veal,* 453 F.3d 164, 167-68 (3d Cir.2006) (internal quotation omitted). This "requires that officers have a reasonable belief that the arrestee (1) lived in the residence and (2) is within the residence at the time of entry." *United States v. Veal,* 453 F.3d 164, 167 (3d Cir. 2006) (quotation marks omitted). "Absent exigent circumstances or consent, the police cannot lawfully search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." *Williams v. City of Philadelphia*, 454 F. App'x. 96, 99 (3d Cir. 2011) (unpublished) (citing *Steagald,* 451 U.S. at 205-06).

The Government argues that a "special needs" standard applies to the search of a probationer's home rather than the higher standard of probable cause. (Docket No. 61 at 10). The Supreme Court has explained that "[a] State's operation of a probation system … presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Griffin v. Wisconsin,* 483 U.S. 868, 873-74 (1987). Individuals who are released on probation "do not enjoy 'the absolute liberty to which every citizen is entitled, but only … conditional liberty properly dependent on observance of special [probation] restrictions.'" *Id*. at 874; *see also United States v. Knights*, 534 U.S. 112, 122 (2001) (upholding a warrantless search of defendant's home because it was authorized by a condition of probation and was also supported by reasonable suspicion that contraband was present). The Third Circuit, reviewing the propriety of a warrantless search on a Pennsylvania probationer who consented to a search of his residence as a condition of parole, held that "no more than reasonable suspicion" was required to justify a search of his residence. *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)); *accord United States v. Perminter*, No. 10-cr-204, 2012 WL 273349, at *7 (W.D. Pa.

13

Jan. 30, 2012) (Fischer, J.) (unpublished) (recognizing that only reasonable suspicion is required instead of a warrant in cases brought against parolees or probationers) (citations omitted).

The Government generally alleges that exigent circumstances may excuse the absence of a search warrant because Defendant posed a threat to the safety of law enforcement or the general public. (Docket No. 61 at 11). Exigent circumstances which may excuse the warrant requirement include: the imminent loss or destruction of evidence, hot pursuit of a fleeing felon; and the risk of danger to police officers or others. *United States v. Butler*, 405 F. App'x. 652, 655 (3d Cir. 2010) (unpublished) (collecting cases).

To enter the residence of the third party and search for Defendant, the police were required to have either probable cause or the consent of that third party. Here, the officers had both. The CI willingly provided Officer Wilner with reliable information that Defendant could be found at the 310 Broadway address. (Tr. at 49-50). Officer Wilner said that CI was clear, articulate and did not appear to be under the influence of any drugs or alcohol. (Tr. at 49). She was the owner of the residence and knew the tenants very well—so well that she frequently stopped by to care for one of them. (Tr. at 56-57). Although the CI did not know Defendant's actual name, she successfully identified him through his mug shot. (Govt. Ex. 2). The CI told Officer Wilner that Defendant was residing at the residence, dealing narcotics and stashing weapons. (*Id*. at 38).[10] The CI even stated that she knew Defendant had not currently been at the residence, but agreed to call back later that night when she knew he would be present. (*Id*. at 44). Based upon the totality of the circumstances known to the officers, they had probable cause to believe that Defendant had been at the residence. *Agnew*, 407 F.3d at 196. Even without probable

---

[10] Although his drug dealing and gun possession were the reasons CI came forward to the police regarding his whereabouts, this was unnecessary to establish probable cause for Defendant's arrest because he had two active bench warrants for his arrest.

cause, the authorities had the consent of the leaseholder and the tenant who answered the door to enter and arrest Defendant.[11] *Steagald,* 451 U.S. at 205-06.

With respect to the cocaine and drug paraphernalia found in the living room, the Government asserts that this evidence is admissible under the plain view doctrine. (Docket No. 61 at 12). The Supreme Court has explained that "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968) (per curiam). In *Coolidge v. New Hampshire*, the Court laid out a test for the application of the plain view doctrine: (1) prior justification for the government's intrusion into an otherwise protected area (such as a home); and (2) the immediately apparent incriminating nature of the evidence. 403 U.S. 443, 466 (1971); *see also Horton v. California*, 496 U.S. 128, 136 (1990) (noting that "an essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," and two additional conditions are that the item must be in "plain view" and "its incriminating character must also be 'immediately apparent'").

Because they had a valid warrant and consent to arrest Defendant, the police were permitted to search the premises for Defendant's person. The digital scale and bag of crack cocaine were lying on a table and the floor nearby, and were in the "plain view" of anyone that would be walking through the area. (Tr. at 68). Also, when a digital scale is located by illegal narcotics, their incriminating nature is immediately apparent and obvious. *Horton*, 496 U.S. at 136. Therefore, the police were entitled to seize these items as they were in plain sight and are admissible evidence. Additionally, due to the valid warrant, once Defendant had been found, he

---

[11] The other co-tenant did not object to a search until after Defendant had already been apprehended. (Tr. at 69).

was subject to a search incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) (holding that a search incident to arrest requires no additional justification other than a custodial arrest based upon probable cause.). This search resulted in the seizure of another bag containing crack cocaine that is also admissible against Defendant.

Last, the Government contends that the subsequent search leading to the seizure of the pistols following Defendant's arrest was valid because police obtained the verbal and written consent of the leaseholder and one of the co-tenants. (Docket No. 90 at 9). "Consent by a third party is valid if there exists such 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Cruz*, 470 F. App'x. 91, 93 (3d Cir. 2012) (unpublished) (citing *United States v. Matlock,* 415 U.S. 164, 171 (1974)). However, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph*, 547 U.S. 103, 126 (2006). Generally, "landlords cannot consent to a warrantless search of their tenant's quarters." *United States v. Lin*, 131 F. App'x. 884, 885 (3d Cir. 2005) (unpublished) (citing *Chapman v. United States*, 365 U.S. 610, 616-617 (1961)). A landlord must share common authority and control over the leased premises with the tenant in order to have authority to consent to the search. *See Matlock*, 415 U.S. at 171; *Lin*, 131 F. App'x at 885 (holding that landlord shared common authority and control over premises because they shared a "family style" living arrangement).

As discussed earlier, the initial consent given by the co-tenant to search for Defendant that resulted in his arrest and the seizure of the bags of crack and digital scale was valid. However, the authorities then asked both of the co-tenants for consent to search the premises following this apprehension. (Tr. at 69). The written "Consent to Search Premises" forms show

that at 10:22 p.m. that night, co-tenant Robert Liberto chose not to consent to a search, (Govt. Ex. 6), while the other co-tenant Donna Gessley consented to a search shortly after at 11:30 p.m. (Govt. Ex. 5). Thus, Gessley was not able to consent to the search of the residence over Liberto's express refusal. Nor may the Government rely upon CI's consent to search the premises following Defendant's apprehension. Because there has been no evidence offered that may suggest that CI shared common authority and control over 310 Broadway Avenue, CI's relationship with the tenants would be seen as that of a landlord. *Matlock*, 415 U.S. at 171. Thus, the subsequent search of the property was not valid due to the refusal by one of the co-tenants.

Nevertheless, the Government also contends that all of the evidence would have been found as a matter of course during the subsequent consented search of the premises. (Docket No. 90 at 9). The inevitable discovery doctrine permits the admission of illegally obtained evidence where it can be shown that such evidence would have been discovered by the authorities through a proper channel. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means … then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received."). The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)).

After the police conducted a search of the residence to find Defendant, they then began to search the premises for additional drugs and weapons. (Tr. at 69). It was during this subsequent search that an officer discovered the pistols hidden above the cabinets. (Govt. Ex. 1 at 2). Had the police conducted this search through the proper channels, and not as a result of the search

based upon invalid consent, they would have inevitably found the two pistols. *See United States v. Parris*, 229 F. App'x 130, 135 (3d Cir. 2007) (unpublished) (holding that gun seized under bed following lawful entry into probationer's residence would have been inevitably discovered by a subsequent search warrant). Based upon the reliable information provided by the CI, Defendant had already been apprehended at the residence and the authorities had already lawfully seized two bags of crack cocaine and the digital scale. The Government has established that it possessed reliable information that Defendant was storing guns above the kitchen cabinets at the residence and that the police would have inevitably discovered them, had they obtained a search warrant. *Stabile*, 633 F.3d at 245. Therefore, the pistols seized by authorities are also admissible.

## IV. CONCLUSION

Based on the foregoing, Defendant's motion to suppress [54] is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   January 22, 2013
cc/ecf:  All counsel of record.